UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHANCE BRANNON,<br><br>Defendant. | Case No.: SACR 23-00100-CJC-1<br><br>SENTENCING MEMORANDUM |

I.      INTRODUCTION & BACKGROUND[1]

Defendant Chance Brannon is a highly intelligent twenty-four-year-old veteran of the United States Marine Corps who has been diagnosed with Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and long-term depression.

---

[1] All facts are taken from the factual basis for Mr. Brannon's guilty plea (Dkt. 55) and undisputed facts and evidence submitted with the Revised Presentence Investigation Report (Dkt. 101) and the parties' sentencing positions (Dkts. 95–98, 105).

(*See, e.g.,* Dkts. 96, 96-1.)  In some respects, Mr. Brannon has benefitted from great advantages in life—growing up with a supportive stepfather whom he calls "Dad" and a loving, very involved mother who, as an experienced clinical psychologist, has expert knowledge in resources and treatment available for children with his mental health diagnoses.  Because of his upper-class background, loving and highly educated parents, and supportive community, he has received intervention from a young age that many families cannot provide for their children.  Mr. Brannon's family has continued to be a source of great support to him as an adult, and until his arrest he continued to live at his mother and stepfather's home in San Juan Capistrano, California.

On the other hand, Mr. Brannon's diagnoses contributed to developmental delays, behavioral struggles from an early age, and rigid thinking.  While in many situations Mr. Brannon exhibits what the Court perceives to be genuine thoughtfulness, generosity, and a desire to make a positive impact on his community and the world, in other contexts he exhibits equally troubling behaviors that have grown from poor self-esteem as a child to hatred of others put into action as an adult.

At about 1:00 a.m. on March 13, 2022, while he was still an active-duty Marine, Mr. Brannon, along with codefendants Tibet Ergul and Xavier Batten, ignited a Molotov cocktail and threw it at the entrance of a Planned Parenthood clinic in Orange County, California, intentionally starting a fire and damaging the clinic.  Planned Parenthood is a well-known multi-state women's health provider that offers a wide range of health, wellness, and education services, including vaccinations, preventative care, mammograms, pregnancy testing, counseling, and procedures to terminate pregnancies, i.e., abortions.  Mr. Brannon planned and carried out this attack specifically "to make a statement against abortion, scare pregnant women away from obtaining abortions, deter doctors, staff, and employees of the clinic from providing abortions, intimidate and interfere with the patients of the clinic, and encourage others to engage in similar acts of

protest." (Dkt. 55 [Plea Agmt.] at 10–11.)

In a text message exchange immediately following the attack, Mr. Brannon and codefendant Batten exchanged the following messages:

> Brannon: It's done.
> Batten: 88.[2]  Did you see how long it lasted?
> Brannon: Not really but it was fucking good.

Cell site location records indicate that Mr. Brannon returned to the Planned Parenthood around 3:03 a.m. before dropping off Ergul and returning to his parents' home in San Juan Capistrano where he was living at the time.

Two months later in May 2022, Batten consulted Mr. Brannon about what measures to take if he wanted to "get away with" destroying another clinic that provides reproductive health services, and Mr. Brannon provided him extensive advice.  Shortly after the Supreme Court released its decision in *Dobbs v. Jackson Women's Health Organization*, which overturned *Roe v. Wade*, in June 2022, Mr. Brannon and Ergul planned to use a second Molotov cocktail to damage or destroy another Planned Parenthood clinic.  The two went so far as to make the Molotov cocktail and travel to the clinic, but they did not complete their plan because they saw law enforcement near the target clinic and wanted to avoid apprehension.  When the FBI later met with Batten in September 2022 because he was posting guides on creating destructive devices on a gaming platform, Mr. Brannon texted him "HEY DUMBASS STOP TALKING TO THE FEDS[.]  … [N]ow it's harder to say 'I was hacked etc' as a defense / It sounds funny but that's reasonable doubt and reasonable doubt is an acquittal." (Dkt. 101 [Revised Presentence Investigation Report, hereinafter "PSR"] ¶ 36.)

---

[2] This is common shorthand for "Heil Hitler" in antisemitic circles.  (*See* Dkt. 97-1 [Hirsch Decl.] ¶ 2.)

Although he did not attack a second clinic, neither Mr. Brannon's desire to address his political grievances through violence nor his animosity towards women subsided. In the following months, Mr. Brannon repeatedly expressed desire to harm women. For example, when discussing an online post expressing support for women's reproductive rights, Mr. Brannon wrote to Batten: "Cultivate rape of this individual . . . This person should be raped to death by donkeys / Reddit faggo bugman talk." (*Id.* ¶ 52.) On another occasion, Mr. Brannon texted another friend: "There are so many annoying rape victim bitches that I have a hard time having sympathy for them / Because the way they act makes me think, 'you should be raped again.'" (*Id.* ¶ 53.) Mr. Brannon later added: "The Idaho killer is already getting female fanmail which isn't surprising at all / Women are fucking disgusting." (*Id.*) Just a month before his arrest, Mr. Brannon told a friend in the military that he "seriously considered raping a woman" one day because the "bitch gave [him] lip in the parking lot and [he] had a flash of just pushing her over and raping her." (*Id.* ¶ 42.) Mr. Brannon then asked the friend if he was going to "stalk" a female soldier stationed nearby. (Hirsch Decl. ¶ 6, Ex. D at 223.) When the friend wrote that he was going to "rape her to death," Mr. Brannon responded: "Please do." (*Id.* at 231–32.) Days later, the same friend asked Mr. Brannon how he would "stop a bitch from stealing all [his] shit" without a prenuptial agreement. (PSR ¶ 53.) Mr. Brannon wrote: "By killing her." (*Id.*)

Around the time he intended to attack a second Planned Parenthood, Mr. Brannon (still an active-duty Marine) also placed calls to the Russian and Chinese embassies in Washington, D.C. Mr. Brannon admits that he briefly considered offering himself up as a "mole" to these foreign governments due to his deep dissatisfaction with the Marine Corps, which he felt had wasted five years of his life by not deploying him to engage in combat.

Mr. Brannon also had other plans.  He and codefendant Ergul hoped to start a race war by attacking an electrical substation, which would disrupt the functioning of Orange County's power grid.  And Mr. Brannon's plans went far beyond mere fantasizing.  On a thumb drive disguised as a military-style dog tag necklace bearing the Marines' motto, "Semper Fidelis," Mr. Brannon kept a file entitled "Delete after reading," which contained an operation plan and gear list for targeting a Southern California Edison substation.  When Mr. Brannon was arrested, he possessed several items on that gear list, including a Zastava ZPap M70 rifle with a handwritten Cyrillic message that roughly translates to "Total N*gger Death."  (*Id.* ¶ 40.)  That thumb drive also contained recordings of the 2019 Christchurch Mosque shooting, a mass shooting in which a white supremacist murdered fifty-one people and injured forty others.

Additionally, Mr. Brannon possessed two illegal firearm silencers, an unmarked short-barreled rifle with no visible serial number, and a Glock 22 .40 caliber handgun with an un-serialized lower receiver and threaded barrel.  In his letter to the Court, Mr. Brannon maintains his motives for possessing these weapons were "banal," reflecting only that he enjoyed shooting as a hobby.  Since he already used restricted weapons in the military and found the regulations precluding possession of such weapons "unjust and pointless," Mr. Brannon thought it "harmless" to modify his personal weapons as he saw fit.  (Dkt. 94-4 at 3.)

Throughout the early summer of 2023, Mr. Brannon and Ergul further discussed and researched how to attack parts of Dodger Stadium on a night celebrating LGBTQ pride.  Mr. Brannon shared a "WW2 sabotage manual" with Ergul, discussed doing "dry runs" to "case" the stadium, and conducted research on infamous bomber Ted Kaczynski.  Mr. Brannon explained to Ergul in discussing their plans that he wanted to "send a message" and noted "God will not be mocked. … Our desire to fight is a gift as

long as we use it right. God makes men warlike for a reason." (PSR ¶ 46.) Just days before his arrest Mr. Brannon also contemplated robbing a bank and "rob[bing] jews" through "home invasions in the Hollywood hills" where he said "every other house would be a child sex dungeon." (PSR at 10.) Fortunately, Defendants were arrested on June 14, 2023, two days prior to the Dodger Stadium event.

Over this time period, Mr. Brannon was at all times an active-duty Marine. His colleagues confirmed that Mr. Brannon frequently made sexist and misogynistic jokes, and one Marine recalled him making comments about killing women who had abortions.

On November 30, 2023, Mr. Brannon pleaded guilty to all counts of a four-count indictment charging him with violations of 18 U.S.C. § 844(n) (conspiracy), 18 U.S.C. § 844(i) (malicious destruction of property by fire and explosive), 26 U.S.C. § 5861(d) (possession of an unregistered destructive device), and 18 U.S.C. § 248(a)(3) (intentional damage to reproductive health services facility). Mr. Brannon now appears before the Court for sentencing.

## II.    CALCULATION OF THE GUIDELINE RANGE

"The district courts, while not bound to apply the [United States Sentencing Commission's Sentencing] Guidelines, must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Thus, when imposing any sentence, the first step for a district court is to calculate the applicable guideline range. *See United States v. Mohamed*, 459 F.3d 979, 985 (9th Cir. 2006).

### A.    Base Offense Level, Adjustments, and Criminal History

The parties agree that Mr. Brannon's base offense level is 24 under U.S.S.G. § 2K1.4, which covers property damage by use of explosives. Mr. Brannon used a

Molotov cocktail in an attempt to destroy a Planned Parenthood medical clinic, "a place of public use," as this guideline contemplates. *See* U.S.S.G. § 2K1.4(a)(1)(B). He then receives a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a–b) for pleading guilty to all counts of the Indictment. Because Mr. Brannon has no criminal history, he is placed in criminal history category I. Based on a total offense level of 21 and a criminal history category of I, the advisory guideline sentencing range is 37 to 46 months' imprisonment.

### B. Departures

After initially calculating the advisory guideline sentencing range, courts determine whether any departures are warranted. The Court, like the Government and Pretrial and Probation Services, believes two upward departures are warranted in this case pursuant to U.S.S.G. § 5K2.0(a)(2)(A), which accounts for circumstances not adequately taken into consideration in determining the applicable guideline range, and U.S.S.G. § 5K2.21, which authorizes an upward departure to reflect the seriousness of uncharged conduct. Specifically, the Court finds a total eight-level increase of Mr. Brannon's offense level appropriate under these two departure provisions.

#### 1. Mr. Brannon's Intimidation of Women and Medical Professionals

Under U.S.S.G. § 5K2.0(a)(2)(A), a court may depart from the otherwise applicable guideline range if there are circumstances that were not adequately taken into consideration in determining that range. Here, the applicable guideline, U.S.S.G. § 2K1.4, accounts for Mr. Brannon's conduct in throwing a Molotov cocktail at a place of public use. But the guideline does not take into account his pernicious motive, which was to intimidate and terrorize women seeking essential medical care and the healthcare

staff providing that care to them. Indeed, Mr. Brannon's offense level would be the same if he were merely acting on a juvenile whim, which is clearly not the case here.

Women today are disproportionately subject to many types of violence and harassment. Mr. Brannon's actions were intended to make one more venue less safe for them: the private and sensitive space of a medical clinic. He succeeded. In the immediate aftermath, the clinic was forced to close, and thirty-three patient appoints had to be rescheduled. But even more consequentially, thousands of women, doctors, and their staff who learned of this attack were undoubtedly traumatized. An upward departure of five offense levels is warranted for, as Mr. Brannon described it, his "domestic terrorism." (PSR ¶ 41.)

### 2. Uncharged Conduct

Mr. Brannon's uncharged criminal conduct also warrants an upward departure under U.S.S.G. § 5K2.21. As part of the parties' plea agreement, the Government agreed not to pursue additional charges, the most obvious of which is Mr. Brannon's possession of several illegal firearms and a second Molotov cocktail in violation of 26 U.S.C. § 5861. (Plea Agmt. ¶ 3.) But Mr. Brannon dodged being charged with much more. He took significant steps toward: (1) bombing another Planned Parenthood to further intimidate and terrorize women and their healthcare providers; (2) bombing Dodger Stadium on its Pride night to intimidate and terrorize the people attending the event; and (3) damaging an Edison power generator in Orange County, hoping to spur a race war. Though Mr. Brannon has pleaded guilty to all the charges against him, which is admirable, his conduct as a whole is extremely disturbing, threatening the safety of many people, and demonstrating a serious disregard for the law. An additional upward departure of three offense levels is appropriate for this troubling uncharged conduct.

Factoring in the five-level upward departure under U.S.S.G. § 5K2.0 and the three-level upward departure under U.S.S.G. § 5K2.21, Mr. Brannon's offense level is 29, resulting in a guideline range of 87 to 108 months' imprisonment.

### III.   18 U.S.C. § 3553(a) FACTORS

18 U.S.C. § 3553 sets forth factors for district courts to consider in imposing a sentence.  Courts must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable sentencing guidelines range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).  The Court finds a 108-month sentence to be necessary to meet the objectives of sentencing under Section 3553.

#### A.   *Nature and Circumstances of the Offense*

The nature and circumstances of Mr. Brannon's offense are particularly disturbing. *See* 18 U.S.C. § 3553(a)(1).  Mr. Brannon built a homemade bomb-like device and threw it at a medical clinic.  He targeted a clinic because of the services its medical providers offered to vulnerable women.  He did so to intimidate and frighten them from seeking and providing essential medical care and to inspire others to engage in similar acts of protest.  Although his acts did not result in bodily injury or death, the circumstances of

Mr. Brannon's offense demonstrate a complete lack of empathy for women and disregard for their rights.

And Mr. Brannon's appetite for domestic terrorism was not satisfied with just one attack. He also planned to attack a second Planned Parenthood clinic, Dodger Stadium, and an Edison power generator. The common thread through his plotted acts of terror was hate for people who did not look or think like him.

### B.     *Mr. Brannon's History and Characteristics*

The Court recognizes that Mr. Brannon's mental health conditions render him more susceptible to acting in this extremely disturbing manner. Overall, his personal history and characteristics are both mitigating and aggravating in certain respects.

Mr. Brannon was born and raised in an upper-class neighborhood in Orange County, California. Although his mother has been consistently and exceptionally supportive and loving, Mr. Brannon struggled as a child and teenager with his biological father's limited presence in his life. His mother and father divorced in 2002, and his mother retained primary custody in San Juan Capistrano. For a while, his father maintained a condo in Irvine, and Mr. Brannon would visit on weekends. But when Mr. Brannon was five or six years old, his father moved to Costa Rica, and visitation decreased to about once a year. Mr. Brannon also grew up with a caring stepfather, whom he calls "Dad" and who coached many of Mr. Brannon's sports teams throughout elementary school, but he still struggled accepting a new father figure in his life. His diagnoses of Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, and depression likely amplified his feelings of abandonment and isolation. However, his mother, who is an experienced psychologist, made sure he had consistent access to

mental health services and treatments from a very early age and strived to facilitate his well-being and success.

Indeed, family, friends, and professionals consistently recognize Mr. Brannon as highly intelligent. His mother reported that at nine years old, Mr. Brannon "was recruited for Johns Hopkins' City-Wide Talent Search due to his exceptional intelligence, placing him in the top one percent in the county." (Dkt. 96-1 at 2.) Mr. Brannon participated in that program for a year before being withdrawn "so he could interact with other children and learn valuable skills such as playing sports and riding a bicycle." (*Id.*) Mr. Brannon graduated from high school with honors and multiple college acceptances, despite lacking motivation and focus. Upon graduation, he enlisted in the Marines and served a five-year term from 2018 through 2023, when he was discharged because of his criminal conduct charged in this case.

In the military, Mr. Brannon was assigned challenging tasks—albeit requiring deskwork, not combat as he had hoped—that many other servicemen would have found too academically challenging. He earned an associate degree in Farsi from the Defense Language Institute in 2020, and his military duties included cryptologic language analysis and language analysis of Persian-Farsi. He received a number of positive recognitions in the Marines, including a good conduct medal, a national defense service medal, a global war on terrorism service medal, a sharpshooting rifle qualification badge, and an expert pistol qualification badge. Unfortunately, while Mr. Brannon fought against terrorism at work, his dogmatic thinking led him to commit an act of domestic terrorism within driving distance of his home and to plot multiple others.

|   |   |
|---|---|
| 1 | Despite excelling in some aspects of his development, Mr. Brannon struggled |
| 2 | (and continues to struggle) in other areas.[3]  His Autism Spectrum Disorder renders Mr. |
| 3 | Brannon prone to rigid thinking.  Perhaps embodying his tendency toward black and |
| 4 | white thinking, despite having reportedly served as the president of the atheist club at his |
| 5 | high school, Mr. Brannon in his letter to the Court describes himself now as a devout |
| 6 | Catholic, which he states strongly informs his beliefs and actions, including his attack on |
| 7 | the Planned Parenthood clinic.  He seems to commit wholeheartedly—dogmatically—to |
| 8 | whatever ideal he presently upholds. |
| 10 | Mr. Brannon's mother described him aptly, saying "Chance is not only one thing |
| 11 | …."  (Dkt. 96-1 at 2.)  She describes Mr. Brannon's "compassionate side" while also |
| 12 | recognizing that he is a "highly impressionable individual" whose tendency to trust |
| 13 | others has long concerned her.  (*Id.*)  Family friends of Mr. Brannon and his mother, |
| 14 | who knew Mr. Brannon as a minor, repeatedly describe him as polite, particularly caring |
| 15 | toward animals, extremely smart, inquisitive, and compassionate.  (*See generally* Dkt. |
| 16 | 96-1.)  As a high schooler, his trusting nature manifested itself in acts of kindness, |
| 17 | including giving "all his summer earnings to a friend who claim[ed] it was needed for |
| 18 | their cat's surgery."  (*Id.* at 2.)  Unfortunately, as an adult, his trusting nature and his |
| 19 | association with individuals encouraging bigotry and violence likely contributed to his |

---

[3] This footnote is redacted on the public docket.  It discusses aspects of Mr. Brannon's private medical and behavioral history that are relevant to the Court's sentencing analysis. ███████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
████████████████

actions that have placed him before this Court and render him vulnerable to future poor impulse control and decision-making.

### C. Protection of the Public

Mr. Brannon has consistently cooperated with the Government from his arrest to his guilty plea, and to his credit, his letter to the Court cogently explains the reasoning behind the charged offenses and for some of the conduct that is uncharged. The articulate and detailed writing embodies Mr. Brannon's obvious intelligence. However, his writing also demonstrates a certain lack of self-awareness that has been described by friends, family, and others who have known or encountered Mr. Brannon. The Court thinks it highly likely that all of Mr. Brannon's statements are sincere—that he has long sought "adventure, camaraderie, self-improvement, and meaning," such as through enlisting in the Marines, and that he desires to "fight for a good cause." (Dkt. 96-4 at 2.) "Fight for a good cause" is often a figurative expression, but Mr. Brannon conveys his overwhelming desire to engage in combat, which was not fulfilled while enlisted in the Marines. He believes that "many young men [including himself] seek and are excited by conflict as a break from the mundane." (*Id.* at 3.) He perceived the Marines as having failed to offer him the opportunity to engage in "righteous conflict" and decided to attack the Planned Parenthood clinic because it was a "morally justifiable" target upon which he could "vent his anger." (*Id.*)

It is apparent to the Court that Mr. Brannon desperately wishes to be neurotypical. But the lack of acceptance of his diagnoses—which the Court imagines must be very difficult—appears to lead Mr. Brannon to normalize his own behaviors. Although many young people—men and women alike—seek adventure, friendship, and contribution to the world, thankfully most do not seek those things through aggression and violence. What concerns the Court deeply in Mr. Brannon's papers and supporting letters is that

there doesn't seem to be widespread acknowledgement that Mr. Brannon's good and dangerous qualities have consistently existed in tandem, despite immense support from his family, community, and psychiatric treatment throughout his life. The dozens of letters submitted on Mr. Brannon's behalf demonstrate a seemingly uniform belief among his community that he will not commit any future offenses and does not pose a threat to the public—in part due to the immense support this community and his family promise to provide. However, the evidence in the record and the contradictions between community members and family members' perceptions of Mr. Brannon and his internal life lead the Court to conclude otherwise. The Court sincerely believes that Mr. Brannon, with help, can rehabilitate himself, especially given the incredible outpouring of love and support so many have offered him as he goes forward. But Mr. Brannon needs time, self-reflection, and dedication to overcome the immensely troubling behaviors and ideologies he has acted upon.

The Court also believes Mr. Brannon when he expresses great remorse for his actions and his ongoing desire to make a positive impact on the world. But candidly, there is no convincing evidence that Mr. Brannon will stop engaging in wrongdoing that he believes to be "morally justified." Mr. Brannon frequently cites God's will as justifying his actions and beliefs. For example, in February 2022, a month before Defendants' attack on the Planned Parenthood clinic, Mr. Brannon texted Batten: "It's raining hard tonight. A sign to wait until another night from God." (PSR ¶ 51.) The following week, Mr. Brannon and Batten exchanged additional messages discussing their religious views regarding murder. Mr. Brannon inquired: "The Church defines murder as the taking of an innocent life. But who is innocent when all men are sinners. Can't find any answers on this." Batten responded, "People who aren't intentionally malicious and do crime," to which Mr. Brannon further asked, seeking moral justification, "So is it ok to kill n*ggas who are malicious?" (*Id.*) When Mr. Brannon and Batten were discussing constructing the Molotov cocktail used in the charged attack,

Mr. Brannon stated: "God bless / Pray for our success." (*Id.* ¶ 28.) And when planning to attack Dodger Stadium on a night celebrating LGBTQ pride, Mr. Brannon wrote that, similar to his motivations for his attack on Planned Parenthood, he wanted to "send a message" and that "God will not be mocked." (*Id.* ¶ 46.) He cited the same desire to fight that he discusses in his letter to the Court, saying that "[o]ur desire to fight is a gift so long as we use it right. God makes men warlike for a reason." (*Id.*) All of these comments—among many others—embody attempts to morally justify egregious acts that would harm and intimidate many victims. And this same moral justification led him to make calls to the Russian and Chinese embassies in an attempt to sabotage the Marine Corps that had so disappointed him. It also led him to disregard firearm regulations he believed were "unjust and pointless." (Dkt. 96-4 at 3.)

The Government argues that "[b]ut for law enforcement's intervention, [the Planned Parenthood bombing] incident would have been the first in a line of domestic terrorism incidents intended to 'send a message' to groups defendant hated." (Dkt. 97 [Gov't's Sentencing Pos.] at 3.) In the Court's analysis, that is true. Although Mr. Brannon explains that he has pursued what he believes to be righteous causes, his actions and plans demonstrate that he is swayed not by what the law, the Marines, his family, or society define as acceptable, but rather what he believes is morally justified, which is in reality frequently misguided and outright wrong.

Though Mr. Brannon argues that his actions should be understood as the product of immature decision-making and internal frustration, his attack, the concrete steps he took toward committing further attacks, and the violent desires he expresses cannot be fairly attributed to youth. He has communicated to friends that he has "seriously considered raping a woman" in a parking lot for communicating with him in a manner he did not like. (*Id.* ¶ 42.) Just ten days before his arrest, Mr. Brannon stated "it takes incredible restraining for me not to take my suppressed rifle and go kill specific people

in LA." (*Id.*)  Mr. Brannon described himself as a "domestic terroris[t]." (*Id.* ¶ 41.) That is not to be taken lightly.

     Mr. Brannon is also complex and multifaceted, he has mental health challenges, and he has made meaningful contributions to his family, his community, and his country. But his sentence must take into account that despite his family and community's perceptions of him as a polite, kind, and generous young man—all qualities which Mr. Brannon demonstrably possesses at times—those positive qualities coexist with extreme aggression and desires to harm others, desires upon which he has acted and planned to further enact.  While his family loves him deeply and expresses sincere commitment to his rehabilitation, Mr. Brannon expresses that he has felt disconnected from and frustrated by their differing views of the world.  Mr. Brannon is remorseful, but the issues that led to his attack remain.  The Court must weigh that heavily in considering how to protect the public.

     Mr. Brannon *has* recognized the wrongfulness and lack of utility of his actions and is attempting to use his time in custody productively.  He expresses a desire to serve in the Red Cross or Peace Corps after pursuing a college education following his release from custody.  Mr. Brannon is smart and capable and has a remarkable support system. The Court commends and encourages him to continue these righteous pursuits and to embrace those who love him and wish the best for him.

     **D.**    ***Remaining Section 3553(a) Factors***

     Of the remaining Section 3553(a) factors, the Court believes only two warrant separate discussion: (1) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and (2) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

As to restitution, the parties agree that Mr. Brannon should pay $1,000 to WRA Property Management, Inc., which owned the building out of which Planned Parenthood operated its clinic, for the damage his attack caused to the facility. The parties further agree that the Court should not impose any fine for Mr. Brannon's offense.

As to avoiding disparities, Mr. Brannon argues that a five-year mandatory minimum sentence is appropriate here based on three other cases in Wyoming, Illinois, and Missouri in which the defendants caused fires that significantly damaged abortion clinics. (*See* Dkt. 96 [Def.'s Sentencing Pos.] at 13.) Mr. Brannon includes articles discussing these cases in his position papers. (*See* Dkt. 96-3.) In the Missouri case, Mr. Brannon highlights that the defendant, who was sentenced to five years' imprisonment, was a dedicated father of four with no criminal history who served in the Navy for eight years. (*See id.* at 3.) The article regarding the Illinois case did not discuss the defendant's background but stated that he caused over $300,000 in property damage. (*See id.* at 5.) Finally, the Wyoming case also did not discuss in detail the background of the twenty-two-year-old defendant who caused nearly $300,000 in damage to a facility there. (*See id.* at 7.) But it did state that she told the court she "did not intend to spread fear … [and] has no hate for the clinic and its employees" and that her parents used "extreme control" and "manipulation" that limited her options in life. (*Id.* at 11–12.) The circumstances in two of these three cases were also quite different from the situation here because the Wyoming and Illinois defendants damaged buildings that were intended to house *future* reproductive healthcare facilities. They did not target open clinics where medical staff were actively providing medical care to many patients. (*See id.* at 5, 7.) The level of intimidation and potential harm to patients and doctors, though still horrific, is far more limited under those circumstances.

But with respect to all three cases, the Court knows very little about the nature and circumstances of the offenses or the defendants' unique personal characteristics and

history. The articles did not describe those defendants as being extraordinarily aggressive or violent, desiring to repeat their crimes, or having committed additional uncharged crimes. In contrast, the Court has a complete picture of Mr. Brannon's offense, his mental health conditions, his hatred toward women and other groups of people, his detailed plans to act on that hate, and his additional uncharged criminal conduct, including possessing many of the firearms he deemed necessary for his planned acts of terrorism. Based on the information before the Court, a five-year minimum sentence would not be appropriate in this case. A high-end guideline sentence of 108 months is necessary to meet the objectives of Section 3553.

### E.   *Sentence Imposed*

Having considered the sentencing factors enumerated in Section 3553(a) including the advisory guideline range of 87 to 108 months, the Court imposes the following sentence:

- 108 month's imprisonment.

- Restitution of $1000, which Mr. Brannon has already paid. (*See* Dkt. 105.)

- A special assessment of $325, which is due immediately.

- A 36-month term of supervised release under the following terms and conditions:

    1. Mr. Brannon shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04, including the conditions of probation and supervised release set forth in Section III of Second Amended General Order 20-04.

    2. During the period of community supervision, Mr. Brannon shall pay the special assessment and restitution in accordance with the judgment's orders pertaining to such payment.

    3. Mr. Brannon shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any other financial gains to the Court-ordered financial obligation.

4. Mr. Brannon shall cooperate in the collection of a DNA sample.

5. Mr. Brannon shall submit his person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under Mr. Brannon's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. Mr. Brannon shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that Mr. Brannon has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

6. Mr. Brannon shall possess and use only those digital devices, screen usernames, email accounts, social media accounts, messaging applications, and cloud storage accounts, as well as any passwords or passcodes for all such digital devices and accounts, that have been disclosed to the Probation Officer upon commencement of supervision. Any new devices, accounts, applications, passwords, or passcodes are to be disclosed to the Probation Officer prior to the first use. A digital device is any electronic system or device that can access, view, obtain, store, or transmit digital data related to.

7. All computers, computer-related devices, and their peripheral equipment, used by Mr. Brannon shall be subject to search, seizure and computer monitoring. This shall not apply to items used at the employment site that are maintained and monitored by the employer.

8. Mr. Brannon shall comply with the rules and regulations of the Computer Monitoring Program, and shall pay the cost of the Computer Monitoring Program.

9. Mr. Brannon shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the program by the treatment provider, with the approval of the Probation Officer.

10. As directed by the Probation Officer, Mr. Brannon shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision. He shall provide payment and proof of payment as directed by the Probation Officer. If Mr. Brannon has no ability to pay, no payment shall be required.

11. Mr. Brannon shall not contact or visit any Planned Parenthood or other reproductive healthcare facility, or any employees, staff, or patients thereof, without prior written approval from the United States Probation Office.

- The Court authorizes the Probation Officer to disclose the Presentence Report, and any previous mental health evaluations or reports, to the treatment provider. The treatment provider may provide information (excluding the Presentence report), to State or local social service agencies (such as the State of California, Department of Social Service), for the purpose of Mr. Brannon's rehabilitation.

- The drug testing condition mandated by statute is suspended based on the Court's determination that Mr. Brannon poses a low risk of future substance abuse.

- The Court recommends that the Bureau of Prisons house Mr. Brannon at FCI Englewood in Colorado, so he may take advantage of the services it offers veterans.

## IV.   CONCLUSION

After considering the applicable advisory guideline range and all the factors and objectives of sentencing under 18 U.S.C. § 3553(a), the Court sentences Mr. Brannon to a custodial term of 108 months followed by a three-year term of supervised release.  This sentence protects the public from future violence.  It takes into consideration the nature and circumstances of Mr. Brannon's offense and his personal history and characteristics.  And it reflects the seriousness of his offense, promotes respect for the law, provides just punishment, and adequately deters criminal conduct.  When released from custody, Mr. Brannon wishes to channel his desire for adventure and conflict toward education and future work with humanitarian organizations.  The Court very much hopes he will follow through, as his intelligence and desire to make meaningful contributions offer much to the community if used for good.

DATED:    April 15, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE